My name is Jeffrey Feiner, I'm the appointed attorney representing appellant Andrew Flatter. There are three issues in this matter. Two are pretrial, they're significant, they're reversible, each of them. I'd like to start, though, with the third one, which is the errors that occurred in a series of incidents at trial, if I may. The third issue involves hearsay and confrontation problem, and let me put the case back into its factual context so that this error makes sense. There were a number of losses of prescription mail reported to the Spokane main post office. These were all prescription narcotics sent by the Veterans Administration to various recipients in eastern Washington. Over a dozen reports of losses made it to the terminal, and an investigation was commenced, beginning with a collection of the dates and times that the losses would have gone through the facility, and a number of other reports. And a partial listing of the employees who would have been at the facility at that time. Some of this information was transferred via e-mail to the inspectors. The partial schedule was assembled by supervisors. We basically allege the following as error. At trial, the background information of the some 14 losses were admitted very precisely, under the limited purpose of showing the inspectors that the losses were in fact, frame of mind, the reason he took his action in his investigation. This is a nonsubstantive use, and I think it is an appropriate use. As the court reviews the record, I objected. The court indicated that for the nonhearsay purpose it was admissible. I asked for a limiting instruction. I got my limiting instruction. No further complaint. However, notwithstanding that the proffer from the government was this was nonhearsay, we see throughout the case, and most explicitly at closing, that the government's purpose for the evidence was substantive. And by that, I specifically direct the court to page 385B of the excerpt of the record, where the government is literally arguing to the jury that this was a nonhearsay. That no more thefts occurred after Mr. Flatter was taken out of the facility, which implies that there were thefts previous. Not just nonsubstantive nonhearsay uses, but the substantive use. And, Your Honors, generally I see this kind of thing in the cases, and lo and behold, counsel usually failed to note the objection. And there's a waiver. I saw this coming. The court can review it. Every time it was mentioned, I objected. I asked for my limiting instruction. I preserved this error throughout, because it was apparent where this could go. And I was unwilling to see my client try on a nonsubstantive basis to have it turned around and used against him. Now, that not being enough, the government then further argued to the jury that after Mr. Flatter's removal from the facility, there were no further reports of loss. This gets into two problems. Again, it's substantive use, implying there had been previous losses, not just for the background. Also, the evidence that there were no further losses came from a conversation with a witness responding to an investigative question posed by Inspector, I think it was Schapp. And that is clearly a Crawford problem, and we object. Were the losses limited to narcotic packages, or was it a general, we haven't had anything stolen off the floor of that operation since he left? The only losses that were the focus of this case were narcotic losses packaged and brought to the mail by the Veterans Administration. It was a very narrow focus to begin with. It was a very narrow focus. It was not regarding all reports of missing mail, but just narcotic missing mail from the Veterans Hospital. Nothing further. Something else I'd like to ask you. In connection with the operation of the Postal Authority, when they hire postal clerks to work in those facilities, is there any express or implied consent or regulation that permits the postal inspectors to make a physical search of a person? I endeavored to find such an item. I could not. The record seems to indicate only that as a government employee, they are subject to the Fourth Amendment constraints, and there has to be reasonable suspicion. It was more than 50 years ago that I worked in the post office. It seemed to me they had one inspector for about every three clerks that they had on the floor. It was incredible. I couldn't comment, but I do believe that at least when you're on the floor as an employee, you are covered by the Fourth Amendment. And so getting to that issue, it does require the routine reasonable suspicion standard to be searched for. They have stations where inspectors sit visibly and can watch people operate on the floor unbeknownst to the person being watched. That's true. And such a thing was utilized in this case. If I may finish up with that first issue, the last point I'd like to make is that there was a best evidence objection as well. The government argued best evidence simply goes to the weight, and that's simply not correct. I wasn't persuaded, but the trial court was. And the fact that the witness was allowed to summarize the contents of a writing without producing the writing, without her ever having an opportunity to see the writing, that that summary was allowed under evidence violates best evidence rule, that the summary was prepared in response to an investigator's question, makes it testimonial, I never had the writer of that summary produced, that's a confrontation error. And I'll end up at the very end, if I have any time left, pointing out why this is not harmless. But if I may, setting that aside, that is our first issue of concern, is that the proffer given by the government was not followed, that the government abused its proffer. So did Judge Van Sickle just allow the postal inspector to testify as to what the email summary was? Correct. In fact, the email summary was used to prepare a chart of all the dates of every theft, 14 of them, 13 matched my client's work patterns, one the agent simply said didn't match and he couldn't figure it out, so he took it off the chart. But this was a one count indictment, right, for the one theft on the date that they confronted him? Correct. And in closing, the government insisted that it only had to prove the one loss, but the government used the evidence of the previous losses as circumstantial evidence, and that's a substantive use. Did they have evidence of complaints from the VA going to the Postal Service? Correct. And those are under Crawford, at least we would still maintain. So was your objection both a Crawford objection and a 404B objection, did you cite both? No, we cited Crawford and best evidence, and depending on the actual terminology I went from one to the other, to be honest, I was being as careful as I knew how. I'm not suggesting you weren't, counsel, I'm just wondering why 404B would permit the government to introduce such evidence. I don't think it does. Well, it was being offered not just to show that he had done this, but simply that the officer stayed in mind in preparing his investigation. And frankly, I'm not troubled by that, as long as they keep to it, as long as the purpose is simply to show why the officer took the steps he took, making a chart, seeing who worked there. I've got to tell you, I think that's fair. I think that's fair. But then I'm going to hold them to it. And what I saw and what I heard was they did not stick to it, even to the moment the closing argument 385B shows it. I objected, it was to no avail. Now, second issue with my discovery attempts. We made a motion to view the high security camera room where the agents were able to use a multiplex video terminal to watch, and it has astonishing resolution capabilities. These cameras zoom in within inches and pull back and they're motorized, they can follow you through the whole place. I wanted to see the setup, partly because I'm curious how good is the screen resolution as opposed to the video. If the screens are two inches across or ten inches across, it makes a difference to me. The court indicated that the government's objection was well taken, that it was a secure area and I wouldn't be allowed in. I pointed out that janitors get to go in there. I can't go in there. All right, fine. The court does, however, say that so long as agents were available to be interviewed, the court felt that was adequate. And again, that seemed okay on balance to me. So a tour and interview were arranged. Now, this record is replete with the government arguing that there was no grant of an interview. However, I provided the court with the actual statement from the trial judge. He said, as long as an interview is available and a tour of the general facility. So on the appointed day, my law clerk and I showed up for our tour and our interview. Turn to page 388 and 389 of the ECR and you'll see my law clerk's notes of that interview. I think that if I put it mildly, I was sniped. Not throughout, not every question. I've got to tell you, for many questions in a row, there was no interference. But at the very first, the question from the government was, where do you want to go? And I said, I'd like to see the interview room. Why do you want to see the interview room? Well, I've got a problem with being asked questions since it goes to my thought processes. But after I said, because I want to see it, it occurred to me, I'm not giving much away. I want to see it because that's where my client was interviewed. No problem. And we went forward. But that set the tone for the rest of this tour and the interview that took place in the interview room. The agents gave answers when they could, but the U.S. attorney, frankly, gave her answers instead. In fact, sometimes I would ask a question and she would say, it's in the reports, move on. I can't work like that. I don't know an attorney under the Sixth Amendment who can work like that. I understand that a witness may decline to be interviewed. It's perfectly understandable and it's boilerplate rule throughout the circuits. But it is also boilerplate rule throughout the circuits and in the canons that in no case, not a government criminal prosecution, not a civil litigation, in no case may opposing counsel interrupt those types of questions, force a heretofore willing witness to not give answers, and then ultimately when the agitation level grew to such a point, my clerk noticed that the AUSA was now wrapping her pencil on the table, and finally she says, don't answer that. Agent, escort Mr. Feiner and Mrs. Sparza out of the complex. Don't answer their questions on the way out. And that's how it ended. Now, that's what I have averred. Those are not findings. There was never a hearing on this because when I came to the court and complained, Your Honor, I went to the tour like you said, but they sniped me. The judge, it literally says he's not going to make findings. It's clear to him that the AUSA appears to be saying, and the record reflects this very patently, appears to be saying there's no harm. Mr. Feiner can have his discovery. The agents are talking to him just this morning. They gave him another piece of paper. The judge left the bench. I turned to the agents. When can we schedule it? They said, well, we're not meeting with you. So at this point, I went to the clerk. We asked the court to reassume the bench, which I think was agitating to him. He heard the complaint. I think he was agitated that I was complaining. And he said I'm not going to make findings, that the witnesses now, I've heard from them. They say they don't want to talk to you, and the case is closed. What I'm here to ask this court is for a remedy. When they were willing to talk to me, the United States government's attorney interfered and terminated the interview. When they were now no longer willing to talk to me, the U.S. District Court judge said, well, what can I do? Nothing. I don't think that is appropriate. I think under Hagegi, first of all, he should have given me a hearing. He should have been allowed to make my record. My law clerk should have been allowed to make her proffer. And when I asked that the agents take the stand under oath and state their reasons, they should have taken the stand and under oath. As it was, they stood up behind the bar in open court on the record, but not under oath, and said, Your Honor, we don't like Mr. Finer's attitude, and we've decided this morning. He literally says, I've decided as of 10.15 this morning I don't want to talk to him. What was the purpose of the hearing? Was this sort of a status conference? I duly filed and noted a motion to depose, because in truth, I don't want it to be misunderstood. I don't want to have my terminology, my manner, or my habits misconstrued. I'd like this on a deposition so that I cannot be subjected to claims that I was disorganized. I was not. That I wrote things on an envelope. That's true. I had my law clerk take the notes. If we're going to do it under this kind of terms, I want it in a formal setting. Besides the rule which permits limited discovery in criminal cases where the witness is unavailable, what case would you cite to us to support an obligation on the part of the government to make the agents available to you? There is no such obligation, nor is there an obligation in the rules for a deposition. It is a matter of first impression, judges. I cannot find an instance where an attorney brought a complaint such as this to the court. But I do analogize to Hagegi first, which is a recent Ninth Circuit case just ruled on a few months ago. Hagegi points out that there are times when a hearing should be had. I think this Court needs a full record. You don't have a full record. You don't have any statements under oath in live court. You don't have any findings from the district court judge. So, frankly, I'm here to ask for relief that this be returned for those hearings. Second of all, if there has been misconduct of the nature I have described, if there is a finding that that is what has occurred, the remedies, if we start at the worst, they don't apply. Dismissal of the case would not apply. Disqualification of the attorney or the agents I think is too harsh, frankly. But access to the agents with a court reporter seems to me the least intrusive, most reasonable way to return the parties to the status ante quo. To the point where we were at, at that tour and interview, where the agents were willing to talk to me. And they were willing to answer my questions. That is the most limited medicine I can find for this disorder, and I don't think it's unreasonable. I'm sorry, I'm going to jump ship. Before you sit down, would you turn to your Fourth Amendment question? I will, thank you. If Judge Tolman has a question related to this, I'd like him to go ahead. My question really was, you now have the testimony of the agent witnesses from the trial, do you not? I do. So what additional information do you think you would find that you were not able to ask at trial when they were under oath? Well, I may have been able to ask, but it is not my habit at trial to dive into areas that apparently so agitated the United States that those extraordinary steps were taken. I had to waltz several of those points. Now, ultimately, would I benefit from the interview? I think I would have, because the point I was at when I was clobbered was, was this sequence chronological? Because my client tells me a different sequence. The witness who was there, the union representative, has had a massive stroke and is incommunicable, cannot communicate anything. So the only person who has the answer to these questions is the agent, and I did the best I could. And by the way, let's turn to the Fourth Amendment area, because that's the area I think I was most prejudiced in. My client was searched for weapons at the time, or patted down, excuse me, for weapons at the time of the interview in the agent's interview. In the interrogation room or their office, whatever it's called. And in actuality, I don't think there's a particular – it doesn't strike me as unusual that they would want to pat somebody down. But the question isn't whether they want to. The question is, is there an articulable reason for them to do so? If the court reads the reasons, every one of them is a reason to be concerned if the man is armed. It's in small quarters. That's a problem if he's armed. It's a confrontational situation. That's true. That's a problem if he's armed. There was another person present, risk to third parties. That's true if he's armed. But every one of them was the question-begging conclusion. If he's armed, all these other reasons are very important. And Cibrone pointed out in a way that the original cases don't make it nearly as explicit. In Cibrone, they pointed out that you can't argue, but many police officers' questions are answered with a bullet. In other words, Cibrone is pointing out you cannot say if someone's armed, this is a bad situation for a cop. Cibrone indicates you must have, for a pat-down, articulable reasons to suspect that this individual is presently armed and dangerous. Now, Andy Flatter, not a smidgen of information that he would be armed. And in fact, the agent, when I first asked him point-blank about it, he says, I had no information, no knowledge that this gentleman had a weapon or posed a danger. But it's routine for me to do these pat-downs, and therein lies the problem. Routine pat-downs are not given under the Fourth Amendment. You want to pat someone down, you need to have an articulable reason. Watering this down to a, well, if he's armed, we would have a problem, standard, is a complete lie. That's the turnaround of the Cary-Cibrone rules. Now, next point. The officer stated he then, doing the pat-down, he looks, and lo and behold, he sees a little mountain range of gray and white something sticking out of my client's back pocket, which he associates with, his words, possibly. Possibly being what I suspected. It was a possible envelope. I thought it could be the envelope. And then he says he took it out, and later going back to it, opens it up, and he determines it is one of the salted envelopes. But doesn't your search issue stand or fall on the reasonable suspicion that he was armed? We don't have to get to whether the district court was correct in concluding that its evidentiary significance was readily apparent if he didn't have the right to conduct the pat-down. If it was not lawful, we don't get to the second step. I'm arguing not in the alternative, but in the event that the court thinks the pat-down was proper, which I think it is not, but if the court thinks it is, this was not plain view. Plain view requires an immediate apparent, and the language of immediate apparent is offered by the United States in its arguments and in its leading questions. But in candor, the agent never on his own offered up anything more than possibly being what I suspected, possible. Your client was wearing tight jeans, and he can see something that looks like an envelope. They're looking for an envelope. I mean, this is what they're looking for. This doesn't strike me as out of bounds if you get past the question of the pat-down. I think that's right, except that even if we get past the pat-down question, it isn't what we think the officer might have thought. It's what the officer says, not subjectively, but what did he see? He saw something that he went no further than saying, I had a suspicion. Well, he didn't stick his fingers down inside the pocket to find out there was a folded envelope. He sees something in the guy's back pocket. Again, he's wearing tight jeans. And if they're looking for an envelope and you see something white peeking above his jeans that he can see in plain view, then that doesn't strike me as out of bounds. Justice Lee in the Hicks case points out that an officer who sees a phonograph in a house that looks like a den of thieves with stolen property cannot flip it over to see the registration number underneath. You cannot insert yourself into someone's sphere of privacy unless you have an immediate apparent PC, virtually, that is associated. Did the officer have any design or unique design to it? It does not exactly. It's gray on the inside, white on the outside. And he described it as a ragged edge that was gray and white. It could well have been. But the reason it was gray and white was because the video cameras would be able to pick up the contrast. And so that envelope was unique because of the contrast it would pick up on the video cameras. I don't think the video cameras ever picked up any contrast. Well, the video cameras may not have in this case, but I believe that's why they described that they had a different color on the inside than they did on the outside. So there would be a contrast. Yes, that's possibly so. These are the standard envelopes. They were used to solve. They weren't specially prepared, except the bottle caps were. I'm well over time, but if I may take 15 seconds and why this is not harmless error, if I may. I think we understand your argument. Thank you. Ms. Lister. May it please the court, counsel. My name is Stephanie Lister. I'm an assistant U.S. attorney from the Eastern District of Washington. And it's my privilege to represent the government this morning. As you know, there are three issues on appeal. And since counsel has addressed the issues, first with the evidentiary issue, and secondly, the discovery issue, and lastly, the search issue, I'm going to go ahead and address those issues in the same order. With respect to the discovery issue, I understand that counsel was concerned that there was evidence admitted to show why this investigation started. This investigation had begun because there were some narcotic losses. The losses were reported to the postal inspectors, and it's different than perhaps 50 years ago. There aren't three postal inspectors to every employee. We didn't have enough postal inspectors in Spokane to investigate this postal theft that we thought occurred at the Spokane Processing Center, because that's where the VA had sent their medication. We had postal inspectors come from Seattle and do this investigation. Why wouldn't it have been sufficient, Ms. Lister, to simply elicit from one of the postal inspector agents, why did you initiate this investigation? Because we had received a report of thefts from the VA from the male patients who weren't getting their prescriptions. Why did you need to gild the lily by introducing all this evidence that the theft stopped and so on? But, Judge, I think that with respect to the losses, that's what we did. And that the judge specifically gave... Why the postal inspector is at the mail handling facility, why do you need to go further? I think that's Mr. Finer's point. He doesn't have any objection to the initial explanation for why we're here, but you did a lot more with that evidence than simply explain why the agents started the investigation. Well, Judge, with all due respect, what happened was the law enforcement, the postal inspectors, put together a chart and a log. And our defense counsel then went through that chart and log, because he was trying to demonstrate that it wasn't just this one particular loss. There were other losses. There were other employees working at the time of these losses. He had color chart, color graph that he had gone through the basis, and so it became a big issue. It wasn't something the government had said, oh, we have these losses and let's go into these. No, we just wanted to say this is why the losses occurred and move on. We were drug into more discussion about that. We were drug into, well, how did you get this information from emails? We didn't intend to admit those emails. We didn't put in the log book because there was no evidence of losses in the log book. So your argument is the defense opened the door and this was a fair reply or a fair comment to Mr. Finer's defense attack on the agents on cross? Absolutely, Judge, and we continued to tell the court we're not offering this for truth that these losses occurred. We're not trying to prove that these prior losses occurred, but just that this is why the investigation started. And that's why the court gave the limiting instruction over and over again, which was the evidence offered at this point is offered not for the truth, but to explain the events that there actually posed. I read the court's limiting instruction. I just want to make sure I understand. You're representing to us that the government did not introduce in its case-in-chief on direct examination these charts. It was only after Mr. Finer opened the door on cross-examination that you admitted this evidence in the SIR rebuttal. Yes, and I want to be very careful, Your Honor, because there's the issue about prior losses, and then there's the issue about future losses and whether or not any reports came in afterwards. And I think that's a separate issue. Which are we talking about here? You've got me confused. Prior losses and why the investigation started. But I did ask on direct whether or not there were any further reports of losses. I asked the Hogan who was with the VA if he had any knowledge of any reports of losses after this event, and I asked the postal inspector if he had received any reports of losses, and he said he had not. And I'll note just for the record that counsel, Mr. Finer, had an opportunity to address this issue, and he specifically stated that he had no objection as to the reports, and that would be an excerpt of Record 318 to 319. So when we had this colloquy about the reports, he didn't have an objection to us saying, well, we didn't have any reports of further loss. That was firsthand information. That was their personal information. They didn't have, no one else had called them about reports of losses. The VA hadn't reported any losses to Hogan. So that was the issue with respect to that evidentiary issues. The other issue that he had was the best evidence on the e-mails, and again, that was something that we had not intended to introduce those e-mails. We weren't proving up those prior losses. We had directed our inquiry as to Mr. Flatter because of these prior losses, but we only charged one count, and we weren't trying to say, well, this was found and that was found. It was opened the door by the defense. I would like to move on to the second issue, Your Honors, which was to do with the discovery. You can put permission unless there are any questions on that other issue. Go ahead. Your Honor, this interview happened because defense counsel wanted to know what happened in the surveillance room. He filed a motion to do that, and the court said, you know, it is law enforcement privilege information, how they set up their cameras, where they place them. And so the judge said, you know, can you accomplish this with an interview? So we met out at the postal facility, which was a number of us, and at first we thought it was just going to be an interview about how this surveillance room works, but Mr. Feiner wanted to see some of the locations in the facility. So we did that. We went on tour, and I noticed in Mr. Feiner's reply brief, he says it was a tour, it wasn't an interview. No, it was a tour in which this is where this mail is sorted, and he would ask, well, how does this work, and where was it finalized, and can you show me this location? And so there were lots of questions that went on during this, and Mr. Feiner wanted to be shown some specific locations about, you know, where mail, if it was ripped, it would be taken to be repacked. He was shown all that. Then we got into a dialogue about he wanted to see the surveillance room, and I said he couldn't see the surveillance room. He said yes, that's what he was here to do. The problem was Judge Van Sickle had ruled that he couldn't see the surveillance room, and that's the reason we were there today, but he was very upset about that. Then there was conversation about he wanted to see the interview room, and I didn't understand where we were going. We'd started this whole process to talk about the surveillance room. We ended up on a tour of the facility, and then he wanted to see the interview room, and he was upset because I thought later he explained that he thought I was interfering with his ability to format a defense. And I was like, well, okay, if he wants to see the interview room, he can see the interview room. Usually, you know, we don't show people jail interview rooms or DEA's interview room, but if you really want to see the interview room, we showed it to him. And then it got more complicated in that I don't know if it's the declarations from the inspectors. I want to make sure I'm correct. Yes. He did see the interview room. Yes. And that's where the rest of this dialogue took place. There was confusion by Mr. Feiner as to who was Inspector Schaub and who was Inspector Shepard. They were the two postal inspectors. So we would ask them questions, and he would get confused on who was who. And you'll see in the declaration of flatter, you know, they said, can you ask which inspector you want of the particular question, and then it got worse. There were yes and no questions. Is there a janitor in the room? Do you have a wastebasket? Do you use it? Do you put paper in it? Do you dump the wastebasket? Well, who dumps the wastebasket? Well, does the janitor have a security clearance? And what they wanted to tell him was, and finally did, the janitor's only in there when they're not in there, and the cameras are off, the monitors are off, so it wasn't as if the janitor was privileged to some sort of secret information. They wanted to be given an opportunity to explain what had happened. The situation deteriorated. I called a halt to that particular interview, and I advised the court that I thought it was becoming unprofessional and uncivilized. So we stopped it. Defense files a motion to depose the witnesses, and the district court listened to both those postal inspectors, and they stated on the record to the court the reasons. And essentially the court said in its findings that it gleaned first that these inspectors thought it was unproductive. They didn't think answering these yes or no cross-examination questions were really helpful, and they also secondly felt that they were being treated unprofessionally and rudely by Mr. Feiner, and that is put in the district court's findings and also in their declarations. So the district court does not order depositions. The district court judge leaves the bench. Mr. Feiner wants to schedule another interview. Witnesses tell me they're not going to do any more interviews. I tell Mr. Feiner that. The judge is called back on the bench. And you'll note in the record that the postal inspector says that he didn't make his final decision, says he made his final decision from 10.05 to 10.30 after listening to defense counsel's representations about what happened during the hearing, and that's at Excerpt of Record 162, lines 20 to 25. So the postal inspectors had been upset about the initial interview, but it was after hearing what had happened in court and the representations of defense attorneys that they made their final decision not to participate in interviews. My point is this. I did conclude the initial interview because I felt it was unprofessional and not helpful. But in terms of whether or not I obstructed these witnesses from participating in further interviews, it was the witnesses who made an independent decision that they didn't want to participate in interviews, and that's what the district court found. What more does the court have to do? He found that he would not compel them because they did not wish to submit to an interview,  but that the court declined to hold a hearing in order to make specific findings as to whether or not Mr. Finer became disruptive or whether you improperly terminated the tour, interview, whatever you want to call it. We don't know from this record, do we? Your Honor, the judge said both indicated that they had made an independent decision that they did not wish to participate in an interview. I understand that. It's clear that the agent said no in the courtroom. The question that I'm asking you is he didn't make any findings with regard to what happened at the mail handling facility. He didn't make any findings as to what happened with the he said, she said, and why did the interview stop. He didn't get into what happened at the tour. It was really a problem. It was a he said, she said, agents say this, law clerk has a page and a half of notes for an hour and a half interview. No, that wasn't on the record. What he did say was the issue is were the witnesses, did the witnesses decide they wanted to participate in interviews or not? Because the witnesses have the right to decide. And once they decided they didn't want to, well then what caused their decision not to? Was it the AUSA interfering with the prosecutor's right to have access to witnesses? And the judge says no. These witnesses, these postal inspectors on the record told the judge why. And the judge then says, you know, they made an independent reason. And I think that's supported by the record. Now, the Hague decision, you know, it talks about it's a fraud case submitted by the defendant about what kind of hearing needs to be had. And in that case, the judge calls the prosecutor up to sidebar and says, why did you ask that question? You know, you've caused a mistrial. And the prosecutor explains, I think there was much more done in this particular instance because both myself and defense counsel had an opportunity to tell the judge what our recollection was. The postal inspectors also had an opportunity to tell the judge. There's no legal requirement that they have to be cross-examined as to their reason. Bottom line is a witness has a right to decide. And if they felt that they were treated rudely, they have the right not to participate in further interviews. And the judge found that was independent. So I don't believe there's an error there. Counsel, would you turn to the Fourth Amendment question, please? Your Honor, I believe the Fourth Amendment issue has to do with defense counsel saying that there was just a suspicion of activity and that it wasn't readily apparent. Now, why are we doing the pat-down? We're doing the pat-down for officer safety. And Judge Van Sickle found that in this particular case. We understand the purpose of it. The question is what articulable facts can you cite to us based on the agent's testimony that established a reasonable suspicion that Mr. Flatter was armed at the time they intended to interrogate him? Well, Judge, my reading of the law is not that you have to prove a defendant is armed before you take a step to do a Terry pat-down for officer safety. Well, it's a two-pronged test, isn't it, under Terry v. Ohio? Is there reasonable – does the officer have reasonable suspicion that criminal activity is afoot? And can he articulate a reason to conduct a pat-down for officer safety? And what they said was that they had seen this activity of him reaching into the finalized mail and then pulling something out, and so they believed that he was involved in this mail theft. No question about that, is there? I hope not. So then the second issue is why. There's nothing about the nature of this criminal activity that would lead you to believe that somebody needed to be armed. This is a solo act. It's apparently occurred. If we're to believe some of the other evidence, it's possible that he's been involved in some 13 or 14 of these things. There's no evidence that there's a gun involved or that he's splitting these things with a big stiletto or something else. We don't have any other evidence that there's a weapon involved. We have evidence that this is a very confrontational situation, which is what the district court found, because of the nature of the situation. We have evidence that it's a very small interrogation or interview room. Did you pat down Mr. Feiner during the day he was conducting his interview? Your Honor, we didn't believe Mr. Feiner was engaged in criminal activity. But it was confrontational. Well, that it was. I think we could take judicial notice of that. But, Judge, I think that to require a law enforcement officer to say, I know specifically that he had a gun is... ...which an officer is going to question somebody can very easily turn confrontational. If I had a post office box, a post office, and I believed that something was missing or that I had four days to come and retrieve my item, and you had taken it and returned it to the sender, and I got very agitated and said, I want to talk to a manager and I want to talk to a manager now, are you going to pat me down before you take me in the back? What if you have to take me back to that little interview room? I mean, I've got a small interview room, confrontational. Do I get patted down? Your Honor, I don't believe that you would be a suspect in a criminal case. This is a defendant who is a suspect in a criminal case, and the agent testifies, he pats him down for officer safety. He doesn't know. Routinely? Yes. Which does not sound to me like articulating a reason in this case as to why he thinks that this suspect may be armed. Well, I think that in this case, he had articulated that it was confrontational. I'm sure the court's aware of the facts. It's a small room, and he says all these things for the facts. I think that if the court finds it, the government, the poor police officer has to say, I know that guy had a gun, so I searched him. We're then asking them to really put their jeopardy. A lot of times, counsel, though, the question of officer safety is in some way related to the nature of the criminal activity suspected. So if we're talking about armed robbery, if we're talking about burglary or something else that involves a violent crime, but this is theft from a postal facility in which the guy had no idea that he was being set up. It was an ordinary day. Nobody had ever had any evidence that the guy would routinely carry a knife or this being the eastern Washington that people were routinely armed. With shotguns or no? You know, it's a situation where- Well, we hope those would be in plain view, but that would be a problem. Judge, it's a situation where he's stealing narcotics. It's a dangerous situation. But that's not a violent crime. It's very confrontational. Well, using narcotics can become violent, and he- But you had no evidence of use, did you? Use is not a violation. Possession would be, but use is not a violation in and of itself. The officer fell for safety. He fell for safety. I'm looking at his testimony, and you had no idea he had weapons. No. You had no idea? At that point when we entered the room, I did not have any idea he had weapons. Yes, but I don't believe the law requires that we know that they actually have weapons before we do a pat-down. Are you concerned about your safety? Yes. Well, sir, it is true that in some of our cases, Judge Beezer's opinion in Ruvalcaba comes to mind, where LAPD officers pull a car of suspected gang members over late at night, that the circumstances surrounding the stop, the fact that there are four suspected gang members in the car, all go to articulable facts for why the officer might have a reason to believe that the suspects may be armed. But it seems to me the best you've got here is I'm about to conduct an interview in a tiny interview room. It's going to become confrontational. And if that happens, then the union shop steward and the agents might be at risk of harm. The question is, under Terry v. Ohio and its progeny, is that sufficient to articulate a belief that Mr. Flatter is armed? I believe it is. But at the risk of – I don't want to repeat myself anymore. I would like to go to an alternate argument on this issue, which is the envelope wasn't found during the pat-down. The envelope is found in plain view. That's not what the district court said. The district court said that he had access to the envelope, and it was plain view, because either, one, he lifted his arms up, which was part of the pat-down, and had raised his vest above his back pocket, or, because the officer was not sure, or the officer lifted up the vest, that's not plain view, and then saw the envelope. Now, under either one of those theories, if you haven't got a right to have a pat-down, you haven't got plain view. Well, I believe the court said that it was close quarters, and because of the close quarters, and when he stood up and he had his back to him, he could see that, ER 107. It was, I'm offering that as an alternate argument. There was a lot of discussion about plain view. Was he articulated that it was suspicious, that it was readily apparent to him that this was the same kind of envelope and matched the decoy packages? So I still believe there was justification for the Terry pat-down. If not, I'm arguing that they saw it in plain view and legitimately. And I don't think there's any dispute that about a half an inch of the packaging was sticking above the top rim of the back jeans pocket. Don't believe so, Your Honor. I think that's uncontested. Counsel, the government, I'm sorry, the district court begins its discussion of plain view with this statement. The government asserts that Inspector Shepard properly observed an item during the pat-down for weapons. And on the next page, which is page 8 of the district court's order, Officer Shepard could not recall whether he had to physically lift the defendant's vest to see the item or whether he could see it because the vest was up. He raised his arms. I think the government started the argument as it's a Terry we found in a pat-down. As we got through the testimony, it wasn't clear that it necessarily was found during a pat-down. The testimony, as the judge goes on to say, is that he stood up and when he turned around, they could see it. I offer it as an alternate theory, but I still stand firm that you don't have to say, I know this person has a weapon before if you think you're in danger, you search. Because if you don't, you risk your safety and the safety of others. Did you do a pat-down at the Union Steward? They asked the Union Steward if he had weapons. They asked him if he had weapons, but he didn't do a pat-down. He wasn't believed to be a criminal defendant suspect. Who else was in the room? Myself, I wasn't patted down. The postal inspectors and Mr. Finer and his law clerk, none of which were under investigation at that time. No, we're talking about the interview. Oh, at that interview? Yeah. Oh, sorry. Sorry, I wasn't worried about you being patted after the tour. Yeah. At that interview. Yes, I did. Your Honor, at that initial interview. The postal inspectors? The postal inspectors, the Union Steward, and the defendant. Okay. All right. Thank you, Ms. Lister. Mr. Finer, I'll give you a minute in rebuttal. I want to meet him after you submit. Oh, okay. Judge Bybee quoted the portion I thought was most significant to the articulable facts found at ECR 126. It isn't that he did not state that he knew there was a gun. He states he had no idea, and that ends that inquiry. As to the other item, as to the new argument that this was invited error regarding hearsay and confrontation, Your Honor, I probably made 20 objections in that trial. Invited error was never discussed. In the attorney's brief for the government in opposition to my request for relief, invited error was never mentioned. It was mentioned for the first time this morning. It's an interesting argument. It's not been briefed, and I don't believe it's supported by the record. I walked that line very carefully because I know how to walk that line. It was not invited error. It was a concern I had throughout the trial. I limited my questions to the specific event and how mail gets to where my client could handle it. The government's attempt to hide behind invited error I think is tardy, and I don't think it's appropriate under the facts. The third one is, as to the request for relief from the government's interference, those findings by the trial court were made without any benefit of my proffer from my witness, who was present at the time, and while it's been described as confrontational and I did get the best laugh of the morning, I specifically deny it. I was shaken. I was sputtering. I was stricken with what was happening in that interview, and to be thrown out of a facility under law enforcement escort was humiliating. Hang on just a second, Mr. Feiner. The case will be submitted, and we'll get you an answer as soon as we can. Mr. Feiner, I'd like to take a minute with you. It has nothing to do about the merits of the case, but I'm looking at your certificate of compliance that's attached to your brief. Yes. And you use the term typeface of 14 points. Do you know what 14 points means? Yes. I used to be a typesetter with lead. Yeah. And what size is it? It's about ten and a half characters to the inch, isn't it? Oh, that's a good question. The conversion, it's seven and a fraction points to an inch, so I couldn't give you an inch conversion. Well, but look what you're using on the brief. I believe I was using 14 points. It's something I can read. Well, it may be that Microsoft or somebody said it was 14 points, but you've got typeface 14 points, and that's exactly what the compliance of the rule requires. I've had two cataracts removed. I've got macular degeneration early on, and when I get small print briefs, they're very difficult for me to read. Was mine that readable? Oh, I read it. Don't worry. It's just more, requires even more concentration. I understand. The local rule in the district in eastern Washington requires 14 points. This is in the federal rules of appellate practice, so you go back to Rule 32 and you get the whole line up there, and I wish you would use it. I'm not the only senior judge on the circuit that has eye problems. Well, as a younger judge, I concur with Judge Feeser.  It really helps because we do so much reading, Mr. Feeser. I'm sorry. 14 points is larger. I'm using the largest print I can reasonably get. I may have made a misunderstanding of the court. You're on a computer. I am, and I'm using large print, but I will discuss this with the compliance staff. Check the type setting. It's great. All right. Thank you. We'll take a ten-minute recess. All right.
judges: Beezer, Tallman, Bybee